[No. G031386. Fourth Dist., Div. Three. Oct. 1, 2003.]

THE ARCHDIOCESE OF MILWAUKEE, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ERIC NATHAN PAINO, Real Party in Interest.

424

**COUNSEL**

McNicholas & McNicholas, John P. McNicholas; Quarles & Brady and Matthew J. Flynn for Petitioner.

No appearance for Respondent.

Law Offices of Freberg & Associates and Katherine K. Freberg for Real Party in Interest.

**OPINION**

**FYBEL, J.—**

I.

INTRODUCTION

In *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262 [127 Cal.Rptr.2d 329, 58 P.3d 2] (*Pavlovich*), the California Supreme Court held an out-of-state defendant may be subject to personal jurisdiction in California based upon evidence establishing the defendant engaged in intentional conduct expressly aimed at or targeting California and the defendant knew the intentional conduct would cause harm in this state. In this case, we apply this "effects" test, as expressed in *Pavlovich*, and conclude the Roman Catholic Archdiocese of Milwaukee (the Milwaukee Archdiocese) is subject to specific personal jurisdiction in California.

Plaintiff Eric Nathan Paino alleged and declared under oath that when he was a boy, Fr. Siegfried Widera (Widera), a Roman Catholic priest, molested him. Widera was working at a parish in Orange County when the alleged molestation occurred. Paino sued the Milwaukee Archdiocese, the Roman Catholic Bishop of Orange (the Orange Diocese), and Widera. Paino alleged the Milwaukee Archdiocese engaged in a cover-up of Widera's prior misconduct, which included a conviction in Wisconsin for sexual perversion against a boy, and arranged for Widera to move to California in 1973.

The evidence showed the Milwaukee Archdiocese sought to rid itself of Widera by sending him into California knowing he was a pedophile and had been convicted in Wisconsin of sexual perversion against a boy. Paino met his burden of proving, for purposes of establishing specific personal jurisdiction, the Milwaukee Archdiocese engaged in intentional conduct expressly aimed at California and knew its conduct would cause harm in this state. We therefore deny the Milwaukee Archdiocese's petition for writ of mandate challenging the order denying the Milwaukee Archdiocese's motion to quash service of summons.

Our opinion resolves only the Milwaukee Archdiocese's writ petition and reviews only jurisdictional facts. We do not address the merit of any claims or defenses.

## II.

ALLEGATIONS AND JURISDICTIONAL FACTS

A. *Widera Is Convicted of Child Molestation in Wisconsin.*

Widera was ordained as a Roman Catholic priest in 1967 and was incardinated in the Milwaukee Archdiocese.[1] He died in 2003.

On July 2, 1973, a criminal complaint against Widera for sexual perversion was filed in Wisconsin Circuit Court. The complaint alleged: "Frank Siegfried Widera, [minor boy] and [minor boy] went from Port Washington to Random Lake on Sat. June 30 and in the course of traveling to Random Lake on or near the intersection of State Highway 57 and County Highway K in the Township of Fredonia, Ozaukee County [minor boy] placed his mouth over the pen[i]s of Frank Siegfried Widera." On August 13, 1973, Widera pleaded guilty and was sentenced to three years' probation.

At the time of arrest, Widera was a priest at St. Mary's Parish in Port Washington, Wisconsin. On July 31, 1973, the Roman Catholic Archbishop of Milwaukee, William Cousins (Cousins), determined Widera had to be transferred immediately from St. Mary's. Both Cousins and the Milwaukee Archdiocesan Personnel Board[2] knew about the criminal conviction and knew Widera was a pedophile. An August 14, 1973 document on the Archdiocesan Personnel Board's letterhead states: "Communication from Archbishop William E. Cousins to J. Theisen, Exec. Sec. of Priests' Personnel Board [¶] . . . [¶] Father Widera was arrested for, as the Milwaukee Sentinel stated it, sexual perversion with young boys. He appeared in the Ozaukee County Court yesterday, August 13, 1973 and was sentenced to three years probation. The Judge, who imposed the sentence, also ordered that Father Widera may *not* return to the Port Washington area. [¶] Father Widera is presently seeing Dr. Leo F. Graham twice a week." Fr. John Theisen (Theisen), director of the Archdiocesan Personnel Board, testified in deposition he knew as of 1973 that Widera was a pedophile and had been criminally convicted of child molestation.

B. *Other Incidents of Child Molestation by Widera in Wisconsin.*

The Milwaukee Archdiocese also knew the child molestation resulting in Widera's conviction was not an isolated incident. Fr. Rolland Glass (Glass)

---

[1] Incardination is a formal state by which a Roman Catholic priest is made subject to the authority of a bishop. (See *Stevens v. Roman Catholic Bishop of Fresno* (1975) 49 Cal.App.3d 877, 885 [123 Cal.Rptr. 171].)

[2] The Archdiocesan Personnel Board's primary purpose was to make recommendations to the Archbishop for placing diocesan priests.

was the pastor at St. Mary's Parish, where Widera had served from 1972 through 1973. On September 3, 1973, Fr. Paul Esser had a conversation with Glass about Widera. Fr. Esser's memorandum of the interview stated: "[Widera] was a 'loner.' He had difficulty relating with adults. He had instant rapport with young boys and spent a lot of time with them. [¶] . . . [¶] 7. A male grade school teacher saw Fr. Widera fooling around with the boys of another teacher. He said to father that if he fooled around in the same way with his students, he would punch Father in the face. [¶] 8. Fr. Glass had reports for some time from within and without the parish that something was wrong. [¶] 9. He coached the boys in basketball. He would be in the shower with the boys—all in the nude. When an adult male entered the shower, Fr. [Widera] covered himself with a towel. [¶] 10. Fr. [Widera] took boys swimming at a motel in Milwaukee. Father knew the owner and could use the pool. This happened over a period of time. [¶] 11. Parishioners came forward after the fact and indicated incidents they had noticed and warnings they had given their own children about not letting Father touch them. [¶] Fr. Glass' mother told Glass that Fr. [Widera] on at least one occasion had a boy sleep with him overnight in the rectory. [¶] 13. Fr. Glass did confront Fr. [Widera]: 'Circumstances are forcing me to draw certain conclusions about you and your conduct with little boys.' Fr. [Widera] stopped seeing boys for a time but then went back to it. [¶] 14. There was a pattern of contact with small bo[ys]."

In early September of 1973, Widera was assigned to "help[] out" at St. Andrew's Parish in Delavan, Wisconsin. Widera was allowed to work with children. In February 1974, the vice-president of the St. Andrew's school board wrote to Theisen, "I'm writing to tell you how pleased we are to have Fr. Sig Widera here in St. Andrew's Parish. He has endeared himself to all who have had contact with him. [¶] The children in our school literally follow him around; he is so kind and shows so much interest in them." Several St. Andrew's parishioners wrote to the Archdiocesan Personnel Board praising Widera's abilities with children. Although Theisen responded to each of these letters, he did not disclose Widera's conviction or other reports of possible child molestation.

On June 29, 1976, Cousins contacted the archdiocese's ombudsman[3] to inform him another allegation had been made against Widera. The ombudsman's notes had this entry for June 29: "Archbishop called - Mike Short, a therapist in Elkhorn, had called in to Bob Sampon—Short is a counselor and now advocate for [redacted text]. She reported to Short that her son had been sexually molested by Fr. Widera while on a weekend fishing outing—Son is [redacted name] age 13, an altar boy at Parish. Archbishop suggested I call Widera first, then Short, assuring complainants that W. will be removed from

---

[3] The ombudsman assisted and represented priests vis-à-vis the bishop and other church officials in addressing problems and concerns, such as allegations of sexual abuse.

parish and will receive in-patient treatment, if necessary." The ombudsman's notes for July had this entry: "Widera admitted that he made 'a slip'. He took boy fishing alone about 3 weeks ago. He had heard nothing about the incident." The ombudsman told Widera he would "try to keep the lid on the thing, so no police record would be made," but Widera probably would be transferred and would need inpatient treatment.

The ombudsman then contacted Widera's therapist, Mike Short. Short stated he would contact the boy's mother and "convince her not to act with police, if Church removes W. from parish, and gets him help, as well as counsels the boy." On July 8, 1976, the ombudsman told Widera "anticipate moving from Delavan after [your] probation is over [¶] not to tell Fr. Henke [the pastor of St. Andrew's] at this time [¶] stay away from [redacted name] [¶] also stay away from another boy [you are] seen with frequently." Widera could not be transferred until after Labor Day because of "replacement problems."

On August 20, 1976, Fr. Henke (Henke) reported allegations made against Widera to the Archdiocesan Personnel Board. Notes from the Archdiocesan Personnel Board stated, "8/20/76—telephone—E. Henke—informed that S. Widera has had an incident with an 11 year old boy a couple of months ago. Henke is concerned that the talk may become vicious against him in such a small town because news travels fast." It is not clear whether the allegations reported by Henke were the same as those reported to the ombudsman by Short. Henke wanted Widera removed.

C. *Widera Goes "On Vacation" to California and Takes Faculties in the Orange Diocese.*

On August 20, 1976, the ombudsman spoke with Henke and Widera. The ombudsman wrote in his notes: "Called Henke and Widera—they agreed that W. would go 'on vacation' (California!) as soon as Waldbauer [4] would find supply help. Then [Widera] would be transferred. W. should tell people only that he's going on vacation." Widera told the Archdiocesan Personnel Board he "plans to leave St. Andrew Parish, Delavan, on Monday, Aug. 23; he plans to go to his brother's place" in Costa Mesa, California. On August 23, the ombudsman told Cousins of these "developments." Widera soon left for California.

On August 27, 1976, the ombudsman wrote in his notes: "Approached Esser about above—the Personnel Board has heard nothing from anyone—

---

[4] Fr. John Waldbauer (Waldbauer) was the executive secretary of the Archdiocesan Personnel Board.

Archbishop has *not* spoken to Personnel Board about this matter [¶] . . . [¶] Paul [Esser] would have a problem in conscience to re-assign Siegfried— When? and should they really—in view of Widera's record???"

In October 1976, Widera contacted the Archdiocesan Personnel Board and asked what positions would be open if he returned to Wisconsin. Widera considered asking for a leave of absence or for work in a California parish.

On October 29, 1976, Waldbauer sent Widera a letter stating: "This letter is written to you to follow our telephone conversation Wednesday morning. This relates to the recommendation of the Personnel Board at its meeting of October 26th. After I spoke with you, I called the Archbishop, who is aware of this direction and supports its intent. [¶] The Personnel Board recommends a choice. First, that you pursue significant counseling to assist you in coming in touch with yourself about the action that has brought about a hasty exit from your last two assignments. . . . Subsequent to such therapy, you would be considered for an appointment within the Archdiocese. The alternative would be for you to be released to the services of another diocese; with the permission of the Archbishop, you would request to minister elsewhere. Should you select the second alternative, the Board would ask periodic reports about your status."

In response, Widera wrote, "the choice of being released to the service of another diocese has its merits." Widera announced he would travel to Milwaukee in November to personally discuss the situation. Widera also wrote: "As to my present situation, I was in contact with Dr. Graham and [the ombudsman] before I left Wisconsin. It was on advice that I left the area. But think that it is time for me to return."

On December 3, 1976, Cousins informed the Archdiocesan Personnel Board that "S. Widera—will spend some time with his parents in Florida and then go to California to continue psychotherapy" and that Cousins "plans to contact Bishop Johnson of Orange to see if there might be something available for Widera." Cousins's authorization was necessary for Widera to work as a priest outside of the Milwaukee Archdiocese. On December 17, 1976, Cousins informed the board he had "called Bishop Johnson in Orange about possibility for S. Widera."

In a letter dated December 20, 1976, Cousins wrote to Bishop William Johnson (Johnson) and the secretary/chancellor of the Diocese of Orange, Fr. Michael Driscoll (Driscoll). Cousins wrote: "A few days ago I talked by phone to Bishop Johnson about a possible pastoral assignment for Father Siegfried Widera of this Archdiocese. The conversation was very general and the Bishop suggested that perhaps something could be done on a temporary

basis. My reason for approaching Bishop Johnson is founded in the fact that Father Widera's brother and family live in Costa Mesa, California. . . . [¶] . . . [¶] Father Widera was ordained in 1967 and has done good work for the Diocese in the places to which he was assigned. In his earlier years there was a moral problem having to do with a boy in school. This seemed adequately confronted through treatment and an intense desire upon Father's part to avoid any repetition of a previous offense. [¶] More recently, however, there has been a repetition, and according to our State Laws further psychiatric treatment is mandated with the strong recommendation that no immediate assignment be made in the environs of the Archdiocese. [¶] Father Widera has cooperated in every way and is presently under treatment. His doctor is somewhat in favor of his leaving the scene but expects that there will be continuing treatment. This has already been arranged and a doctor in California will take over at this point. From all the professional information I can gather there would seem no great risk in allowing this man to return to pastoral work, but there are legal complications at present writing. Incidentally, these legal technicalities would permit Father's going to another State as long as treatment is continued. [¶] . . . [¶] There is no thought of incardination involved, and I am quite willing to accept the man back into the Archdiocese whenever circumstances would indicate. Though I anticipate no recurrence of this past aberration, I would certainly want to be informed if the slightest suspicion were to develop. I would like to show fraternal charity to a fellow priest but I cannot be virtuous at the expense of a fellow Bishop."

On January 10, 1977, Widera was appointed as associate pastor "in hospitality" at St. Pius V Parish in Buena Park. Driscoll wrote to Cousins confirming the appointment. In response, Cousins wrote a letter to Johnson confirming Widera would remain a member of the Milwaukee Archdiocese and stating: "Permit me to express my sincere thanks to you and those involved for this consideration of a priest who has done good work and whose absence from the Diocese is predicated upon the local situation discussed in earlier letters. [¶] I fully expect that upon the recommendation of those professionally helping him at the present time he will be reassigned in our Archdiocese." Cousins also wrote to Widera telling him: "According to our earlier conversations, your stay in California will be determined by the doctor recommended to you before your departure and to whom I confidently trust you have committed yourself for necessary help. Treatment is important to you and essential to your future assignment, but I have every reason to believe that you will accept this condition and work towards an early return."

The Milwaukee Archdiocese did not inform the Orange Diocese of Widera's criminal conviction for sexual perversion, provided no specific information regarding any of the molestation allegations, and did not warn that Widera might be a danger among children. Driscoll testified he would not

have recommended accepting into the Orange Diocese any priest who had a criminal conviction or who posed a danger to minors.

During the period in which Widera worked in California but was incardinated in Wisconsin, he remained subject to the jurisdiction, authority, and control of the Archbishop of Milwaukee. The Archbishop of Milwaukee had the authority to recall Widera to Wisconsin, to remove his faculties as a priest, to investigate whether he had committed acts of molestation, and to petition the Pope to laicize him.

Widera worked at St. Justin Martyr Parish in Anaheim from April 1977 to July 1981. Widera allegedly molested two boys while serving at St. Justin Martyr. There is no evidence these allegations were reported at the time to any church officials. In July 1981, Widera was transferred to St. Edward's Parish in Dana Point because diocesan policy was to rotate associate pastors every four years.

D. *Widera Is Excardinated from the Milwaukee Archdiocese and Incardinated in the Orange Diocese.*

In October of 1981, Widera sought incardination into the Orange Diocese. Under canon law, a diocesan priest cannot be incardinated in two dioceses at the same time. (See *Stevens v. Roman Catholic Bishop of Fresno, supra,* 49 Cal.App.3d at p. 885.) The proper canonical process was to excardinate Widera from the Milwaukee Archdiocese and to incardinate him into the Orange Diocese. Once a diocesan priest becomes incardinated in a new diocese, his relationships, obligations, and connections with the former diocese cease.

Widera was excardinated from the Milwaukee Archdiocese and incardinated in the Orange Diocese on November 23, 1981. Widera accordingly was removed from the Milwaukee Archdiocesan priest fund, personnel roll, pension plan, priest senate, and payroll.

Correspondence between the Milwaukee Archdiocese and the Orange Diocese was exchanged during the process of Widera's excardination and incardination. In a letter dated October 27, 1981, Driscoll formally requested the Archbishop of Milwaukee to excardinate Widera. Driscoll wrote, "Father Widera came to the Diocese *for medical reasons* and [Cousins] wrote [Johnson], regarding the possibility of extending the Hospitality of the Diocese of Orange to Father Widera while he was *on leave* from the Archdiocese of Milwaukee." (Italics added.) In a letter dated November 23, 1981, enclosing the letter of excardination, Msgr. Sylvester Glass, the Milwaukee Archdiocese's Vicar General, wrote to Driscoll: "Canon 117, 2s[degrees]s

mentions that testimonials regarding the priest's birth, life, moral character and studies are to be provided by the excardinating bishop. If you have need of any or all of this pertinent information, we shall be happy to provide it." In a letter to Glass dated December 4, 1981, Driscoll thanked the Archbishop of Milwaukee for granting Widera's request for excardination and stated, "[r]egarding the materials on file in your Chancery Office concerning testimonials of Father Widera, we believe that these testimonials can remain on file in the archives of the Archdiocese of Milwaukee and it is not necessary to forward them to us." None of the correspondence from the Milwaukee Archdiocese mentioned Widera's criminal conviction.

Widera's decree of incardination in the Orange Diocese stated the diocese was "officially advised that you [Widera] have [received] a decree of excardination from THE ARCHDIOCESE OF MILWAUKEE *with assurance of your good character, your course of studies and your good example.*" (Italics added.)

After incardination in the Orange Diocese, Widera worked at several parishes until he was assigned to St. Martin de Porres in Yorba Linda in July 1985. Paino attended St. Martin de Porres. Paino declared under oath: "When Father Widera was transferred to St. Martin de Porres, he immediately began to befriend me and my family. [¶] . . . In 1985, shortly after he came to St. Martin de Porres, and when I was 8 years old, Father Widera began to molest me."

## III.

### PROCEEDINGS IN THE TRIAL COURT

In April 2002, Paino filed a complaint against the Orange Diocese, the Milwaukee Archdiocese, and Widera, alleging 11 causes of action based upon alleged acts of sexual abuse. Paino alleged that "[e]ven though the Defendants Dioceses knew and should have known that Father Widera had molested and sexually abused minors, and even though the Defendant Dioceses had actual and constructive knowledge of the molestations and sexual abuses, the Defendants Dioceses[] covered up the molestations and abuses by Father Widera, continued to allow Father Widera to act as a Catholic priest within the Defendants Dioceses[], continued to hold Father Widera out as a Catholic priest who could be trusted with minor parishioners and minor students, continued to allow Father Widera to work with minor parishioners and minor students on a daily basis, and continued to move Father Widera around to different Catholic churches within the Defendants Dioceses[]."

The Milwaukee Archdiocese moved to quash service of summons for lack of personal jurisdiction. Paino opposed the motion.

At the hearing on October 21, 2002, the court denied the motion to quash, stating: "I'm going to deny the motion. I believe that the critical issue of whether this moving party deliberately and purposefully availed itself of the jurisdiction of the State of California is one that requires that I deny the motion. [¶] The evidence is certainly sufficient to show that the Archdiocese in Milwaukee chose to place this troublesome member of its clergy here in California as a sort of lend-lease program with the hope that he would be out of their sight and out of their jurisdiction. [¶] But the danger may or may not have been adequately explained. Even if the danger was fully explained, I think the issue there doesn't alter the court's conclusion about the Archdiocese of Milwaukee's deliberate and intentional availing of the facilities here in California. [¶] That may well pass the responsibility on to the Diocese of Orange, but it doesn't mean that the Archdiocese of Milwaukee did not intentionally avail itself of the facilities here in California. [¶] So I have to deny the motion."

The Milwaukee Archdiocese filed a petition for writ of mandate challenging the order denying its motion to quash. We issued an order to show cause, asked for a response to the petition, and heard oral argument.

## IV.

### Burden of Proof and Standard of Review

"When a nonresident defendant challenges personal jurisdiction, the plaintiff bears the burden of proof by a preponderance of the evidence to demonstrate the defendant has sufficient minimum contacts with the forum state to justify jurisdiction." (*DVI, Inc. v. Superior Court* (2002) 104 Cal.App.4th 1080, 1090 [128 Cal.Rptr.2d 683]; see also *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 [58 Cal.Rptr.2d 899, 926 P.2d 1085] (*Vons*).) The plaintiff must " 'present facts demonstrating that the conduct of defendants related to the pleaded causes is such as to constitute constitutionally cognizable "minimum contacts." [Citation.]' " (*DVI, Inc. v. Superior Court, supra,* 104 Cal.App.4th at pp. 1090–1091.) "An unverified complaint has no evidentiary value in meeting the plaintiff's burden of proving minimum contacts." (*Id.* at p. 1091.)

■ When the evidence of jurisdictional facts is not in dispute, whether the defendant is subject to personal jurisdiction is a legal question subject to de novo review. (*Vons, supra,* 14 Cal.4th at p. 449.) When evidence of jurisdiction is in dispute, the trial court's determination of factual issues is reviewed for substantial evidence. (*Ibid.*; see also *DVI, Inc. v. Superior Court, supra,* 104 Cal.App.4th at p. 1091.) We must accept the trial court's resolution of factual issues and draw all reasonable inferences in support of

the trial court's order. (*Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 584 [122 Cal.Rptr.2d 24].) "The ultimate question whether jurisdiction is fair and reasonable under all of the circumstances, based on the facts which are undisputed and those resolved by the court in favor of the prevailing party, is a legal determination warranting our independent review." (*Id.* at p. 585.)

## V.

### JURISDICTIONAL REQUIREMENTS

California courts may exercise jurisdiction over nonresidents "on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc., § 410.10.) The statute "manifests an intent to exercise the broadest possible jurisdiction, limited only by constitutional considerations." (*Sibley v. Superior Court* (1976) 16 Cal.3d 442, 445 [128 Cal.Rptr. 34, 546 P.2d 322].)

The federal Constitution permits a state to exercise jurisdiction over a nonresident defendant if the defendant has sufficient "minimum contacts" with the forum such that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' [Citations.]" (*Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 66 S.Ct. 154].) "The 'substantial connection,' [citations], between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State.* [Citations.]" (*Asahi Metal Industry Co. v. Superior Court* (1987) 480 U.S. 102, 112 [94 L.Ed.2d 92, 107 S.Ct. 1026].)

"Personal jurisdiction may be either general or specific." (*Vons, supra,* 14 Cal.4th at p. 445.) A nonresident defendant is subject to the forum's general jurisdiction where the defendant's contacts are " 'substantial . . . continuous and systematic.' " (*Ibid.,* quoting *Perkins v. Benguet Mining Co.* (1952) 342 U.S. 437, 445, 446 [96 L.Ed. 485, 72 S.Ct. 413].) In that situation, the cause of action need not be related to the defendant's contacts. (*Vons, supra,* 14 Cal.4th at p. 445; *Cornelison v. Chaney* (1976) 16 Cal.3d 143, 147 [127 Cal.Rptr. 352, 545 P.2d 264].) "Such a defendant's contacts with the forum are so wide-ranging that they take the place of physical presence in the forum as a basis for jurisdiction." (*Vons, supra,* 14 Cal.4th at p. 446.)

If the nonresident defendant does not have substantial and systematic contacts with the forum state, the defendant may be subject to specific jurisdiction if (1) " 'the defendant has purposefully availed himself or herself of forum benefits' " with respect to the matter in controversy, (2) " 'the

"controversy is related to or 'arises out of' [the] defendant's contacts with the forum,' ' " and (3) the exercise of jurisdiction would comport with fair play and substantial justice. (*Pavlovich, supra,* 29 Cal.4th at p. 269; *Vons, supra,* 14 Cal.4th at pp. 446, 447; see also *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 472, 476 [85 L.Ed.2d 528, 105 S.Ct. 2174].)

## VI.

### DISCUSSION

Paino does not assert the Milwaukee Archdiocese is subject to general jurisdiction in California. He contends the trial court was correct in concluding the Milwaukee Archdiocese was subject to specific jurisdiction because the Milwaukee Archdiocese purposefully availed itself of forum benefits by taking actions to move Widera, a known pedophile, into California, where he continued to molest boys.

### A. *Purposeful Availment.*

The purposeful availment inquiry focuses on the defendant's " 'intentionality' " and is satisfied " 'when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on' his contacts with the forum." (*Pavlovich, supra,* 29 Cal.4th at p. 269.) The purposeful availment requirement is intended to ensure a defendant will not be haled into a jurisdiction solely as a result of " 'random,' 'fortuitous,' or 'attenuated' " contacts, or as a result of the " 'unilateral activity' " of another party or a third person. (*Ibid.*) Purposeful availment asks whether the defendant's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 [62 L.Ed.2d 490, 100 S.Ct. 559].)

#### 1. *Express Aiming or Targeting*

■ Under the "effects" test for determining purposeful availment, a defendant might be subject to jurisdiction in the forum state if the defendant engaged in intentional conduct *"expressly aimed at or targeting* the forum state," and the defendant knew the intentional conduct would cause harm in the forum. (*Pavlovich, supra,* 29 Cal.4th at p. 271.)

In *Pavlovich, supra,* 29 Cal.4th at page 262, the Supreme Court considered whether a California court properly exercised personal jurisdiction over a defendant based upon the posting of an Internet Web site. Pavlovich was a

Texas resident and had no contacts with California. (*Id.* at p. 266.) He founded and was leader of a video project which operated a Web site that posted the source code of a program named DeCSS. (*Id.* at pp. 266–267.) DeCSS allowed a user to circumvent the Content Scrambling System (CSS), which prevents the playing or copying of copyrighted motion pictures recorded on digital versatile discs (DVD's). (*Ibid.*) In short, DeCSS allowed a user to download copyrighted movies onto the user's hard drive or other storage media. (*Ibid.*)

DVD Copy Control Association, Inc. (DVD CAA), is a nonprofit trade organization organized under Delaware law with its principal place of business in California. (*Pavlovich, supra,* 29 Cal.4th at p. 266.) DVD CAA's purpose was to control and administer licensing of CSS technology. (*Ibid.*) DVD CAA sued Pavlovich in California, alleging he misappropriated its trade secrets by posting the DeCSS program on his Web site. (*Id.* at p. 267.) The evidence showed Pavlovich knew of an organization which controlled the use of CSS technology, but did not learn that organization was DVD CAA or that DVD CAA had its principal place of business in California until after the lawsuit was filed. (*Ibid.*) DVD CAA asserted personal jurisdiction on the ground Pavlovich knew his actions would harm California businesses.

The California Supreme Court examined and clarified the effects test for determining purposeful availment. (*Pavlovich, supra,* 29 Cal.4th 262.) The court turned first to *Calder v. Jones* (1984) 465 U.S. 783 [79 L.Ed.2d 804, 104 S.Ct. 1482] (*Calder*) in which the United States Supreme Court described the " 'effects test' " in the defamation context. (*Pavlovich, supra,* 29 Cal.4th at p. 269.) In *Calder*, a reporter in Florida wrote an article for the National Enquirer about Shirley Jones, a well-known actress who lived and worked in California. Jones sued the reporter and the editor for libel in California. They moved to quash service of process on the ground they lacked minimum contacts with California. (*Calder, supra,* 465 U.S. at pp. 785–786.) The United States Supreme Court disagreed, and upheld jurisdiction because "[t]he allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. . . . [T]he brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California." (*Id.* at pp. 788–789, fn. omitted.) The defendants' intentional conduct was "expressly aimed at California," where the defendants knew it potentially would harm Jones. (*Id.* at p. 789.)

The *Pavlovich* court recognized the lack of uniformity in applying the *Calder* test. (*Pavlovich, supra,* 29 Cal.4th at p. 270.) In particular, the

*Pavlovich* court acknowledged that courts have struggled over whether *Calder* stands for the broad proposition that a foreign act with foreseeable effects in the forum state always gives rise to specific jurisdiction. (*Ibid.*) The *Pavlovich* court reviewed federal and out-of-state cases and concluded, "virtually every jurisdiction has held that the *Calder* effects test requires intentional conduct *expressly aimed at or targeting* the forum state in addition to the defendant's knowledge that his intentional conduct would cause harm in the forum." (*Id.* at p. 271, fn. omitted.) The *Pavlovich* court "join[ed] with those jurisdictions that require additional evidence of express aiming or intentional targeting." (*Id.* at p. 273.)

Applying the effects test, the *Pavlovich* court concluded Pavlovich was not subject to California jurisdiction because there was no evidence the Web site targeted California or any California resident visited the Web site. (*Pavlovich, supra,* 29 Cal.4th at p. 274.) The court concluded Pavlovich's knowledge that his tortious conduct might harm certain industries *centered* in California, though relevant to any determination of personal jurisdiction, "*alone* is insufficient to establish express aiming at the forum state as required by the effects test." (*Id.* at p. 278.)

### 2. *Application of Effects Test*

Did the Milwaukee Archdiocese engage in intentional conduct expressly aimed at or targeting California, knowing the intentional conduct would cause harm in this state? The evidence supports the conclusion the Milwaukee Archdiocese intentionally sent Widera to California to get him out of Wisconsin where he had been convicted of sexual perversion against a boy and could create further problems for the Milwaukee Archdiocese. As the trial court concluded, "the evidence is certainly sufficient to show that the Archdiocese of Milwaukee chose to place this troublesome member of its clergy here in California as a sort of lend-lease program with the hope that he would be out of their sight and out of their jurisdiction." The evidence supported the conclusion the Milwaukee Archdiocese knew Widera was a pedophile and posed a serious threat of sexually abusing boys in California. By sending a known pedophile into California, the Milwaukee Archdiocese aimed its intentional conduct directly at this state. The brunt of the harm, indeed all of the harm, resulted in California. Having sent Widera into California knowing he was a convicted child abuser and a pedophile, the Milwaukee Archdiocese reasonably could expect to be haled into court in California to answer for the consequences of its actions.

The Milwaukee Archdiocese contends the evidence does not support a finding of purposeful availment. The Milwaukee Archdiocese contends Widera voluntarily moved to California in 1976 because he had family here.

The evidence supports a contrary conclusion. As part of his sentence for sexual perversion, Widera was ordered not to return to the Port Washington, Wisconsin area. Henke, the pastor of St. Andrew's Parish, wanted Widera removed. Concerns were raised over whether Widera could "in conscience" be reassigned within the Milwaukee Archdiocese "in view of Widera's record." A cover story was created: Widera would go " 'on vacation' " to California. In the ombudsman's notes, the words "on vacation" were set off by quotation marks. When asked why he was leaving, Widera was instructed to say "only that he's going on vacation." After going to California, Widera wrote: "It was on advice that I left the area."

Once Widera was in California, the Milwaukee Archdiocese never recalled him, although it had the power to do so, never questioned him, never monitored his treatment, and never conducted an investigation to determine whether he continued to molest boys. The Milwaukee Archdiocese allowed Widera to be excardinated so he could be incardinated in the Orange Diocese. Accepting the trial court's resolution of factual issues and drawing all reasonable inferences in support of the trial court's order (*Integral Development Corp. v. Weissenbach, supra,* 99 Cal.App.4th at p. 584), we conclude the evidence supports the finding that the Milwaukee Archdiocese made and enacted a concerted plan to rid itself of Widera by intentionally placing him in California.

The Milwaukee Archdiocese contends it sufficiently disclosed Widera's prior misconduct to the Orange Diocese. The Milwaukee Archdiocese points to Cousins's letter of December 20, 1976, in which Cousins wrote that Widera "[i]n his earlier years" had "a moral problem having to do with a boy in school" and that "[m]ore recently . . . there has been a repetition."

Is it relevant to the "effects" test whether or not the Milwaukee Archdiocese disclosed Widera's prior misconduct to the Orange Diocese? No. The Milwaukee Archdiocese rid itself of Widera by sending him into California, knowing he was a pedophile and had been convicted of perversion with a boy. The Milwaukee Archdiocese's conduct was intentional and was expressly aimed at California. The Milwaukee Archdiocese knew its intentional conduct would cause harm in California. Thus, the Milwaukee Archdiocese's conduct satisfied the "effects" test, regardless whether it gave the Orange Diocese "fair warning" of Widera's prior misconduct.

Even if considered, Cousins's letter, with all reasonable inferences favoring the trial court's order (*Integral Development Corp. v. Weissenbach, supra,* 99 Cal.App.4th at p. 584), supports the conclusion the Milwaukee Archdiocese engaged in express aiming at or targeting California. The letter appears to be intentionally vague and incomplete; it does not describe what is meant by "a

moral problem," does not disclose when the "moral problem" occurred, does not identify the repetition, and, most importantly, does not disclose Widera's criminal conviction for sexual perversion. The letter states, "there would seem no great risk in allowing [Widera] to return to pastoral work" when, in fact, there was great risk in allowing Widera to be near boys. In fact, the record contains no evidence the Milwaukee Archdiocese ever informed the Orange Diocese of Widera's criminal conviction or specifically described his misconduct.

Another issue remains in applying the effects test. In *Pavlovich, supra,* 29 Cal.4th 262, the court concluded Pavlovich's knowledge that his tortious conduct might harm certain industries *centered* in California was not dispositive of jurisdiction. "Because the only evidence in the record even suggesting express aiming is Pavlovich's knowledge that his conduct may harm industries centered in California, due process requires us to decline jurisdiction over his person." (*Id.* at p. 278.) Some federal courts, in formulating the effects test, have concluded " 'express aiming' encompasses wrongful conduct individually targeting a known forum resident." (*Bancroft & Masters, Inc. v. Augusta Nat. Inc.* (9th Cir. 2000) 223 F.3d 1082, 1087; see also, e.g., *Cybersell, Inc. v. Cybersell, Inc.* (9th Cir. 1997) 130 F.3d 414, 416.)

Here, the Milwaukee Archdiocese did not know who Paino was and could not have expressly aimed its conduct at him. ▮ However, we do not believe the effects test required the Milwaukee Archdiocese to know the identities of Widera's future victims. This is not a situation, as in *Pavlovich,* where the defendant's conduct *could* harm any of a number of industries and businesses, some of which *might* be centered in California. The nature of the Milwaukee Archdiocese's conduct—sending a pedophile priest directly into California—meant the Milwaukee Archdiocese's conduct *would* harm California residents. In other words, the Milwaukee Archdiocese's conduct targeted a known group of California residents—boys, specifically, Roman Catholic boys—as a means of getting Widera out of the Milwaukee Archdiocese. Such targeting is, we believe, sufficiently individualized to satisfy due process because the Milwaukee Archdiocese could reasonably anticipate being haled into court in California.

The Milwaukee Archdiocese argues the case of *Doe v. Roman Catholic Diocese of Boise, Inc.* (1996) 121 N.M. 738 [918 P.2d 17, 1996 NMCA 57] is "strikingly similar" and supports quashing service of summons. We disagree. In that case, the Roman Catholic Bishop of Boise granted a priest's request to leave Idaho and seek assignment as a priest elsewhere. (*Id.* at p. 740.) The priest went to New Mexico, where he was accused of molesting a boy. (*Ibid.*) The New Mexico Court of Appeals held the Roman Catholic Diocese of Boise was not subject to jurisdiction in New Mexico

because the diocese played no part in the priest's decision to settle in New Mexico, but only granted the priest permission to leave Idaho. "The fact that after the Boise Diocese gave Father Garcia permission to leave Idaho, Father Garcia subsequently selected New Mexico from among several other possible diocesan destinations in which to seek employment as a priest does not constitute a purposeful act by the Boise Diocese to avail itself of the benefits and protections of New Mexico law." (*Id.* at p. 744.)

Here, in stark contrast, the Milwaukee Archdiocese did not merely approve a request to work outside the Milwaukee Archdiocese or acquiesce in Widera's move. Rather, the evidence supports the finding the Milwaukee Archdiocese sought to rid itself of Widera by intentionally sending him into California.

We conclude Paino met his burden of proving by a preponderance of the evidence that under the effects test, the Milwaukee Archdiocese's conduct met the purposeful availment requirement for specific jurisdiction in California. In reaching this conclusion, we do not, and need not, consider canon law; accordingly, we deny Paino's request for judicial notice.

B. *Relationship Between the Milwaukee Archdiocese's Contacts and the Forum.*

We next determine whether Paino's claims are related to or arise out of the Milwaukee Archdiocese's forum contacts. (*Pavlovich, supra,* 29 Cal.4th at p. 269.) "A claim need not arise directly from the defendant's forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction. Rather, as long as the claim bears a substantial connection to the nonresident's forum contacts, the exercise of specific jurisdiction is appropriate." (*Vons, supra,* 14 Cal.4th 434, 452; see also *Cornelison v. Chaney, supra,* 16 Cal.3d 143, 148 ["The crucial inquiry concerns . . . whether the cause of action arises out of or has a substantial connection with [the forum] activity"].)

Paino alleged, "[i]n or about 1985, when Plaintiff was about 8 years old, and continuing through when Plaintiff was 9 years old, Father Widera molested Plaintiff and Plaintiff's brother." Paino alleged the Milwaukee Archdiocese knew Widera had sexually abused boys but "covered up the molestations and abuses," continued to allow Widera to act as a Catholic priest, held out Widera as a priest who could be trusted with minors, and continued to allow Widera to work with minors.

Paino's claims bear a substantial connection to the Milwaukee Archdiocese's forum contacts. As explained above, the evidence supports the

conclusion the Milwaukee Archdiocese purposefully availed itself of forum benefits by engaging in intentional conduct expressly aimed at California. That conduct consisted of ridding itself of Widera by sending him to California. Paino alleged Widera—the man whom the Milwaukee Archdiocese sent to California—molested him. Paino's claims for sexual abuse arise out of the same kind of conduct that prompted the Milwaukee Archdiocese to send Widera to California.

The Milwaukee Archdiocese argues it had no connection with California at the time Paino was allegedly molested. As the Milwaukee Archdiocese argues, the Orange Diocese was responsible for Widera's assignments after 1977, Widera was incardinated in the Orange Diocese in 1981, and Paino was not allegedly molested until four years later. In essence, the Milwaukee Archdiocese is asserting its conduct could not have caused Paino's injuries because, at least by 1981, the Orange Diocese had assumed responsibility for Widera. In *Vons, supra,* 14 Cal.4th at pages 460–467, the California Supreme Court firmly rejected a proximate cause test for analyzing the relation between the defendant's forum contacts and the plaintiff's claims in determining specific jurisdiction. "To require that the injury be proximately caused by the forum contact is to require that the injury 'arise out of' the forum contact in the strictest sense. Such a requirement is inconsistent with the formulation that appears in [United States Supreme Court authority] . . . . [Citations.] . . . [and] is inconsistent with the relevant standard in *Cornelison* [*v. Chaney*]. . . ." (*Id.* at p. 462.)

Thus, for jurisdiction purposes, the question is not whether the Milwaukee Archdiocese's forum contacts were the proximate cause of Paino's injuries, but whether Paino's claims "bear[] a substantial connection" to those contacts. (*Vons, supra,* 14 Cal.4th at p. 452.) We conclude Paino's claims are substantially connected to the Milwaukee Archdiocese's intentional conduct expressly aimed at California.

C. *Fair Play and Substantial Justice.*

Having determined the Milwaukee Archdiocese established minimum contacts with California and those contacts are substantially related to Paino's claims, we must consider whether the assertion of specific jurisdiction is fair. In assessing fairness, we consider (1) the burden on the Milwaukee Archdiocese of defending in California, (2) California's interests, (3) Paino's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, and (5) " 'the shared interest of several States in furthering fundamental substantive social policies.' " (*Asahi Metal Industry Co. v. Superior Court, supra,* 480 U.S. at p. 113; see also *Vons, supra,* 14 Cal.4th at p. 476.) The defendant bears the

burden of presenting a "compelling case" that jurisdiction would be unreasonable. (*Burger King Corp. v. Rudzewicz, supra,* 471 U.S. 462, 477; *Integral Development Corp. v. Weissenbach, supra,* 99 Cal.App.4th at p. 591.)

Although the Milwaukee Archdiocese is a not-for-profit organization, it is sufficiently large that defending itself in California would not impose an unreasonable burden on it. California has a particularly strong interest in asserting jurisdiction over the Milwaukee Archdiocese. California has an interest in protecting its children from sexual abuse and providing them a forum to assert such claims. California also has an interest in not becoming the target for pedophiles from other jurisdictions. Paino, a California resident, certainly has an interest in obtaining relief in California for alleged sexual molestation occurring in California. Asserting jurisdiction over the Milwaukee Archdiocese in California would provide the most efficient resolution of the controversy because Paino's claims against the Orange Diocese are pending here. Finally, Wisconsin and California have a shared interest in furthering the social policy of protecting children from sexual abuse; that social policy is furthered by asserting jurisdiction over the Milwaukee Archdiocese in California.

We therefore conclude assertion of jurisdiction over the Milwaukee Archdiocese is fair.

### DISPOSITION

The Milwaukee Archdiocese's petition for writ of mandate is denied. Paino shall recover his costs incurred in this proceeding.

Sills, P. J., and Rylaarsdam, J., concurred.

Petitioner's petition for review by the Supreme Court was denied January 14, 2004.