**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1919-22

JA/GG DOE 70,

     Plaintiff-Respondent,

v.

DIOCESE OF METUCHEN, a/k/a
THE ROMAN CATHOLIC
DIOCESE OF METUCHEN, a/k/a
THE ROMAN CATHOLIC
BISHOP OF METUCHEN, ST.
JOHN VIANNEY, and ST. JOHN
VIANNEY SCHOOL,

     Defendants-Respondents,

and

DIOCESE OF RICHMOND,
a/k/a CATHOLIC DIOCESE
OF RICHMOND,

     Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **December 7, 2023**
>
> **APPELLATE DIVISION**

     Argued October 10, 2023 – Decided December 7, 2023

     Before Judges Gilson, Berdote Byrne, and Bishop-Thompson.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-5430-21.

David P. Corrigan (Harman Claytor Corrigan & Wellman) of the Virginia bar, admitted pro hac vice, argued the cause for appellant (Santomassimo Davis LLP, David P. Corrigan, and Melissa Y. York (Harman Claytor Corrigan & Wellman) of the Virginia bar, admitted pro hac vice, attorneys; Alexander J. Anglim and Susan Schleck Kleiner, of counsel and on the briefs).

Jack P. Boyd (Jeff Anderson & Associates PA) argued the cause for respondent JA/GG Doe 70 (Gianforcaro Law, attorneys; Jeffrey R. Anderson (Jeff Anderson & Associates PA), Trusha P. Goffe (Jeff Anderson & Associates PA), Gregory G. Gianforcaro, and Jack P. Boyd, of counsel and on the brief).

The opinion of the court was delivered by

GILSON, P.J.A.D.

Plaintiff alleges that Father John Butler, a Catholic priest, sexually abused him from approximately 1995 to 1998, when plaintiff was approximately nine to twelve years old.[1] The issue presented is whether one of the defendants, the

---

[1] Plaintiff used initials and a fictitious designation in his complaint. We use initials to protect privacy interests concerning allegations of child sexual abuse. See R. 1:38-3(c)(9).

Catholic Diocese of Richmond (Richmond), is subject to personal jurisdiction in New Jersey.

The record established that (1) Butler had been incardinated to Richmond at the time of his ordination in 1957, and that Butler remained a priest incardinated to Richmond until 2002; (2) in the 1960s, Richmond had been aware of Butler's sexual propensities towards children; (3) in 1970, Richmond encouraged and allowed Butler to go to New Jersey to serve as a priest; and (4) Richmond maintained a significant degree of control over Butler while he served in New Jersey. Based on those facts, the trial court held that Richmond was subject to specific personal jurisdiction in New Jersey regarding Butler's actions in New Jersey.

Richmond appeals, arguing it is not subject to personal jurisdiction in New Jersey because it did not purposefully avail itself of any benefit from New Jersey. Because the factual findings by the trial court are supported by substantial, credible evidence in the record, and because those facts establish that Richmond purposefully availed itself of the benefits of allowing Butler to go to New Jersey to serve as a priest, we agree that there is specific personal jurisdiction over Richmond and affirm.

I.

3

We discern the facts from the record developed during jurisdictional discovery. We note that although Richmond and plaintiff vigorously dispute how those facts should be characterized, the material jurisdictional facts are supported by credible evidence in the record.

Richmond is a non-profit, religious organization based in Henrico County, Virginia. Its area of service is entirely in Virginia. Butler had been ordained and incardinated as a priest of Richmond in 1957.

Incardination is an ecclesiastical term indicating a priest's acceptance into a diocese. See Merriam-Webster's Collegiate Dictionary 628 (11th ed. 2003). A priest is subject to the authority of the bishop of the diocese where he is incardinated. Glossary of Terms, The Diocese of Springfield, Mass., https://diospringfield.org/osevaglossaryofterms/ (last visited Nov. 30, 2023); see also Stevens v. Roman Cath. Bishop of Fresno, 123 Cal. Rptr. 171, 176 (Cal. Ct. App. 1975). To minister, a priest must be incardinated in a diocese and may only be incardinated in one diocese at a time. See Stevens, 123 Cal. Rptr. at 176.

Butler served as a priest within Richmond's geographic boundaries for approximately the first four years of his priesthood; that is, from 1957 to 1960. In 1958, Butler was accused of grooming a young boy and was reprimanded by

4

the Chancellor of Richmond for taking the boy on a trip out of town. In 1960, Butler was arrested in Washington, D.C. for "public homosexual activity." Those charges were dropped on the condition that Richmond "remove [Butler] from [the] area."[2]

Thereafter, the Bishop of Richmond "ordered Butler" to go on a short retreat. In 1961, Butler obtained permission from Richmond to serve as a priest in the Diocese of Rockville Centre, New York (the Rockville Diocese). In 1965, while Butler was serving in the Rockville Diocese, he was accused of and admitted to sexually abusing two boys, aged thirteen and fourteen years old at the time. Butler was terminated by the Rockville Diocese and the Bishop of Richmond was notified.

In 1968, the Bishop of Richmond wrote to Butler informing him that he could not give him any further assignments within the geographic area of Richmond because Butler would not be able to "successfully exercise [his] priestly ministry in [Richmond]" due to Butler's "past problems." The Bishop of Richmond went on to tell Butler: "I recommend that you seek a benevolent [b]ishop in some diocese where you could get an entirely new and fresh start."

_____

[2]   Many of the facts confirming that Richmond knew of Butler's sexual propensities in the 1960s are set forth in a summary of "accusations against [Butler]" prepared by the Bishop of Richmond in 2004.

Nevertheless, Butler was assigned to two parishes within the geographic area of Richmond between 1968 and 1970.

In 1970, Butler sought permission from Richmond to serve as a priest in the Diocese of Trenton in New Jersey. Richmond gave its permission, and the Bishop of Richmond described Butler's service as an "experiment."

In 1982, the Diocese of Metuchen was formed out of the Diocese of Trenton. At that time, Richmond again gave Butler permission to serve in New Jersey as an "extern priest."

In 1986, Butler was determined to be eligible for Richmond's retirement plan and credited with eight years of service for the time he had spent working within Richmond's geographic area. Butler was also offered the opportunity to be credited with an additional thirteen years of service if he paid into the plan from 1986 to 1999. In other words, Butler was offered the right to be part of Richmond's retirement plan even as he continued to work as a priest in New Jersey.

Butler served as a priest in New Jersey from 1970 to 2002. During the entire time Butler served as a priest in New Jersey, he remained incardinated in Richmond. In July 2002, Richmond suspended Butler from "all priestly

A-1919-22

ministry." Thereafter, he did not receive any further priestly assignments and, in 2005, the Vatican dismissed Butler from the priesthood.

In September 2021, plaintiff filed a complaint in New Jersey, alleging that Butler had sexually assaulted him from 1995 to 1998, while Butler was assigned to the parish of St. John Vianney Church in the Diocese of Metuchen. Plaintiff named as defendants the Diocese of Metuchen, Richmond, the parish of St. John Vianney and its affiliated school, as well as fictitiously named entities and persons. The complaint alleges causes of action of negligence, negligent training and supervision, and negligent retention, all in connection with the sexual abuse that plaintiff allegedly suffered. In that regard, plaintiff alleges that Butler was under the direct supervision, employment, and control of defendants, that defendants knew or should have known of Butler's history of child sexual abuse, and that defendants were negligent in placing Butler in a priestly position where he had access to children.

In February 2022, Richmond moved to dismiss the claims against it for lack of personal jurisdiction. The trial court denied that motion without prejudice and ordered discovery on the issue of jurisdiction. After the close of jurisdictional discovery, Richmond refiled its motion to dismiss for lack of personal jurisdiction.

A-1919-22

On January 23, 2023, after hearing oral argument, the trial court issued an order and written statement of reasons denying Richmond's motion to dismiss. The trial court found that Richmond knew of Butler's history of child sexual abuse, encouraged and allowed him to serve as a priest in New Jersey as a way of sending him outside of Richmond's geographic boundaries, and maintained a significant degree of control over Butler while he was serving as a priest in New Jersey. Based on those facts, the trial court held that Richmond was subject to specific personal jurisdiction in New Jersey.

We granted Richmond's motion for leave to appeal the January 23, 2023 order.

## II.

On appeal, Richmond makes four primary arguments. First, it contends that the trial court's factual findings are not supported by the record. Second, it argues that the trial court erred in concluding that Richmond was subject to specific jurisdiction in New Jersey. In making that argument, Richmond contends that a determination on personal jurisdiction is separate from a determination of liability and the trial court incorrectly considered liability. Richmond also asserts that the trial court erred in holding that Richmond purposefully availed itself of benefits from New Jersey. In its third argument,

8

Richmond asserts that the trial court's conclusion that Butler remained an employee of Richmond was impermissibly based on the ecclesiastical doctrine of incardination. Finally, Richmond argues that the trial court did not determine that plaintiff's injuries arose from or were related to Richmond's purposeful contact with New Jersey.

A. The Law Concerning Personal Jurisdiction.

Personal jurisdiction is a "'mixed question of law and fact' that must be resolved at the outset, 'before the matter may proceed.'" Rippon v. Smigel, 449 N.J. Super. 344, 359 (App. Div. 2017) (quoting Citibank, N.A. v. Est. of Simpson, 290 N.J. Super. 519, 532 (App. Div. 1996)). We review a trial court's findings of fact with respect to jurisdiction "to determine if those findings are supported by substantial, credible evidence in the record." Id. at 358. The trial court's conclusions of law, however, are reviewed de novo. See ibid. "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"A New Jersey court may exercise in personam jurisdiction over a non-resident defendant 'consistent with due process of law.'" Bayway Refin. Co. v. State Utils., Inc., 333 N.J. Super. 420, 428 (App. Div. 2000) (quoting R. 4:4-

4(b)(1)). Courts "exercise jurisdiction over non[-]resident defendants 'to the uttermost limits permitted by the United States Constitution.'" Jardim v. Overley, 461 N.J. Super. 367, 377 (App. Div. 2019) (quoting Avdel Corp. v. Mecure, 58 N.J. 264, 268 (1971)).

For a non-resident defendant to be subject to personal jurisdiction in the forum state, due process requires that the defendant "have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)); Blakey v. Cont'l Airlines, Inc., 164 N.J. 38, 65 (2000). "[T]he requisite quality and quantum of contacts is dependent on whether general or specific jurisdiction is asserted." Citibank, 290 N.J. Super. at 526. General jurisdiction "requires affiliations 'so "continuous and systematic" as to render'" a non-resident organizational defendant "'essentially at home in the forum State.'" Daimler AG v. Bauman, 571 U.S. 117, 133 n.11 (2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)). Plaintiff and Richmond agree that Richmond is not subject to general jurisdiction in New Jersey. Accordingly, we focus on whether there is specific jurisdiction.

A-1919-22

"In order for a state court to exercise [specific] jurisdiction over a non[-]resident defendant, the lawsuit 'must aris[e] out of or relat[e] to the defendant's contacts with the forum.'" Jardim, 461 N.J. Super. at 376 (third and fourth alterations in original) (quoting Daimler AG, 571 U.S. at 127); accord Waste Mgmt., Inc. v. Admiral Ins. Co., 138 N.J. 106, 119 (1994), cert. denied, 513 U.S. 1183 (1995); see also Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. ___, 141 S. Ct. 1017, 1025 (2021). In other words, courts examine the "relationship among the defendant, the forum, and the litigation." Lebel v. Everglades Marina, Inc., 115 N.J. 317, 323 (1989) (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)).

"The 'minimum contacts' requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff." Ibid. (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297-98 (1980)); see also Waste Mgmt., 138 N.J. at 126 (explaining that "the existence of minimum contacts turns on the presence or absence of intentional acts of the defendant to avail itself of some benefit of a forum state"). "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'" Ford, 141 S. Ct. at 1025 (quoting Keeton v. Hustler Mag., Inc., 465 U.S. 770, 774 (1984)). Moreover, courts determine, based on the defendant's

"'conduct and connection' with the forum state . . . whether the defendant should 'reasonably anticipate being haled into court [in the forum state].'" Bayway Refin., 333 N.J. Super. at 429 (alteration in original) (quoting World-Wide Volkswagen, 444 U.S. at 297).

In determining whether the requirement to comport with "fair play and substantial justice" is satisfied, courts evaluate several factors. Asahi Metal Indus. Co. v. Superior Ct., 480 U.S. 102, 113 (1987). A court "must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." Ibid. It must also weigh "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies." Ibid. (quoting World-Wide Volkswagen, 444 U.S. at 292).

B.    The Trial Court's Findings of Fact Related to Jurisdiction.

In evaluating whether Richmond was subject to specific jurisdiction, the trial court found (1) Richmond "was aware of Butler's sexual propensities towards children" in the 1960s; (2) Richmond "released Butler and allowed him to go to New Jersey as [Richmond] felt it was not safe to assign [Butler] to [the] Virginia-Washington area due to his prior arrest;" and (3) Richmond "maintained a significant degree of control and influence over Butler" while he

12

was serving as a priest in New Jersey. Richmond challenges those factual findings. Having reviewed the record, we determine that the trial court's findings of material fact related to jurisdiction are supported by substantial, credible evidence in the record.

First, there is evidence that Richmond knew of Butler's propensity to sexually abuse children. That evidence includes (1) a January 1958 letter from the Chancellor of Richmond to Butler reprimanding him for taking a boy he was accused of grooming on a trip out of town; and (2) documents establishing that Richmond knew of Butler's admission of abusing two boys while he was serving as a priest in the Rockville Diocese in 1965. Indeed, Richmond's knowledge of Butler's sexual predilections was confirmed in a document the Bishop of Richmond prepared in 2004. In that document's "summary of accusations against" Butler, the then-Bishop of Richmond acknowledged that by 1965, Richmond was aware of Butler's sexual abuse of at least three different children.

Second, there is evidence that Richmond encouraged and allowed Butler to serve as a priest in New Jersey. On February 1, 1968, the then-Bishop of Richmond wrote to Butler and informed him that he would not allow Butler to serve as a priest in the geographic area of Richmond. The Bishop also "recommended" that Butler seek to serve as a priest in another diocese.

Thereafter, Richmond gave its permission for Butler to serve as a priest in New Jersey two times.  The first permission was given when Butler began to serve in the Diocese of Trenton in 1970, and the second permission was given when Butler began to serve in the Diocese of Metuchen in 1982.

Richmond criticizes the trial court, pointing out that it relied on a letter from the Bishop of Richmond to the Diocese of Norwich, Connecticut. Richmond contends that the trial court added a reference to New Jersey to the letter, then erroneously relied on the letter to conclude that Richmond sought out a position for Butler in New Jersey.  Although the trial court made an alteration to this letter that added a reference to New Jersey in its written opinion, we do not discern that as reversible error.  The important facts from the letter to Norwich are that Richmond acknowledged that Butler would not be allowed to work in Richmond's geographical area, and that Richmond hoped that Butler could work somewhere else as a priest.

Third, there is ample evidence that Richmond maintained significant control over Butler while he was serving as a priest in New Jersey.  As already summarized, Butler could only serve as a priest in New Jersey with the permission of the Bishop of Richmond.  An important jurisdictional fact is that throughout the time Butler served as a priest in New Jersey, Richmond had the

14

sole authority to recall Butler and end Butler's priestly ministry. That fact is confirmed because Richmond exercised that authority in 2002. While 2002 is after the alleged sexual abuse occurred, Richmond's authority existed throughout the time that Butler was serving in New Jersey. So, Richmond could have ended Butler's priestly ministry at any time between 1970 and 2002.

We also reject Richmond's contention that the trial court impermissibly interpreted and applied the ecclesiastical doctrine of incardination. The trial court correctly stated that it was not interpreting the ecclesiastical doctrine. Instead, it evaluated Richmond's actions. Richmond does not dispute that Butler remained a priest incardinated to the Bishop of Richmond throughout his career. That meant that the Bishop of Richmond always had the authority to suspend all of Butler's activities as a priest. That factual reality is not based on the ecclesiastical doctrine of incardination; rather, it is based on the factual implication of the doctrine.

C.    Analysis.

Applying the jurisdictional facts to the well-established law concerning specific personal jurisdiction confirms that New Jersey has specific personal jurisdiction over Richmond related to plaintiff's action. Richmond purposefully encouraged Butler to go to another diocese. When Butler reached out to the

Diocese of Trenton, Richmond approved Butler going to the diocese to serve as a priest. Plaintiff alleges he was sexually abused by Butler while Butler was serving as a priest in New Jersey in the mid-1990s. Accordingly, plaintiff's claims arise out of Richmond's deliberate and intentional actions to allow Butler to serve as a priest in New Jersey. Butler was not in New Jersey because of his unilateral actions. The record establishes that Butler needed permission from Richmond to serve as a priest in New Jersey. As already detailed, the facts also establish that Richmond always had the authority to end Butler's priestly ministry. Accordingly, Richmond should have reasonably anticipated being haled into court in New Jersey related to Butler's priestly service in New Jersey.

Exercising specific jurisdiction over Richmond also comports with "fair play and substantial justice." Richmond does not contend that it would be burdensome for it to appear in New Jersey. New Jersey has a substantial interest in ensuring that residents of New Jersey are protected from sexual abuse. See, e.g., Child Victims Act, L. 2019, c. 120, § 9 (codified at N.J.S.A. 2A:14-2b(a)) (providing a two-year revival window for victims to file otherwise time-barred claims in New Jersey for sexual abuses committed against them while minors). Finally, the plaintiff has a substantial interest in obtaining relief. Moreover,

16

both Virginia and New Jersey have a shared interest in holding persons responsible for the sexual abuse of minors.

In making that last point, we clarify that we are not expressing any view on the merits of plaintiff's liability claims. Richmond challenges the trial court's decision, contending that the trial court improperly focused on liability as opposed to specific personal jurisdiction. We agree with Richmond that an analysis of personal jurisdiction is independent of the question of whether the defendant is liable to the plaintiff. While the trial court's statement of reasons referenced liability, we do not deem that discussion reversible error. The trial court correctly focused on the facts giving rise to specific personal jurisdiction over Richmond. Similarly, our analysis is focused on the facts establishing that Richmond purposefully availed itself of sending Butler to New Jersey.

Richmond also challenges the trial court's conclusion that Butler remained an employee of Richmond. We do not believe that specific personal jurisdiction over Richmond is dependent on whether Butler was an employee of Richmond while serving as a priest in New Jersey. Instead, the material jurisdictional fact is that Richmond exercised a significant degree of control over Butler serving as a priest in New Jersey. To repeat, it was Richmond that always had the authority to suspend Butler from all priestly ministry, and the decision not to

17

exercise that authority was a purposeful and intentional act that impacted plaintiff while he was a resident of New Jersey.

We also reject Richmond's argument that its contacts with New Jersey only involved communications sent from Virginia. The cases Richmond cites concerning the limitations on communications establishing specific personal jurisdiction are distinguishable. See Baanyan Software Servs., Inc. v. Kuncha, 433 N.J. Super. 466 (App. Div. 2013) (holding no specific personal jurisdiction over defendant non-resident employee who was hired to work remotely in Illinois and whose only contacts with New Jersey were communications with the plaintiff company); Pfundstein v. Omnicom Grp. Inc., 285 N.J. Super. 245 (App. Div. 1995) (holding no specific personal jurisdiction over a New York corporation in severance agreement dispute with plaintiff, a New Jersey resident, where the corporation's only contacts with New Jersey were its telephone and mail communications with plaintiff); Cath. Diocese of Green Bay, Inc. v. John Doe 119, 349 P.3d 518 (Nev. 2015) (holding no specific personal jurisdiction over non-resident diocese where non-resident diocese allegedly knew of priest's past sexual abuse, gave him permission to leave, and wrote a letter of recommendation, but was not alleged to have affirmatively sent him away).

In contrast, the facts here establish that Richmond acted with intent to avail itself of a benefit in New Jersey by sending one of its troubled priests to New Jersey. The credible evidence in the record establishes that Richmond was not willing to suspend Butler from his priestly duties until 2002. In 1970, and again in 1982, Richmond purposefully availed itself of New Jersey by encouraging and allowing Butler to go and remain as an active priest in New Jersey.

Finally, Richmond cites to several cases from other jurisdictions and argues those cases provide support for holding that Richmond is not subject to personal jurisdiction in New Jersey. The cases from other jurisdictions all turn on their specific facts. Indeed, some of those cases found personal jurisdiction over non-resident Catholic dioceses, while others did not. Our review of those cases supports our holding that Richmond is subject to specific personal jurisdiction in New Jersey based on the jurisdictional facts of this case.[3] See Archdiocese of Milwaukee v. Superior Ct., 5 Cal. Rptr. 3d 154 (Cal. Ct. App. 2003) (finding personal jurisdiction where non-resident diocese knew of priest's prior sexual abuse, facilitated his transfer to California, and excardinated him so

_____

[3] The parties also cite to unpublished opinions, but we do not rely on or cite to unpublished cases because they do not constitute binding precedent. R. 1:36-3.

19                                                A-1919-22

he could be incardinated in a California diocese); <u>Tercero v. Roman Cath. Diocese of Norwich</u>, 48 P.3d 50 (N.M. 2002) (finding no personal jurisdiction over non-resident diocese where non-resident diocese had dismissed priest prior to his arrival in forum state and priest was under exclusive control of resident archdiocese at the time of the abuse); <u>Archdiocese of Detroit v. Green</u>, 899 So. 2d 322 (Fla. Dist. Ct. App. 2004) (finding no personal jurisdiction where priest moved to forum state without non-resident archdiocese's permission); <u>Doe v. Roman Cath. Diocese of Boise, Inc.</u>, 918 P.2d 17 (N.M. Ct. App. 1996) (finding no personal jurisdiction where non-resident diocese was not alleged to have had knowledge of any prior sexual abuse by priest and took no action to facilitate priest's placement in forum state beyond approving the transfer).

In summary, having reviewed the record, we determine that the trial court's findings of jurisdictional fact are supported by substantial, credible evidence in the record. We hold that those facts establish specific personal jurisdiction over Richmond in this action.

Affirmed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1919-22